[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

# FILED

Jalisha Tolbert ⟩
⟩
_____ ⟩
⟩
Plaintiff(s), ⟩
⟩
v. ⟩
Circana ⟩
⟩
_____ ⟩
⟩
Defendant(s). ⟩

JAN 1 2 2024 ᴊxᴍ

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Case Number: _____

**1:24-cv-00330**
**Judge Thomas M. Durkin**
**Magistrate Judge Jeannice W. Appenteng**
**CAT. 2 / RANDOM**

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is Jalisha Tolbert _____ of the

county of _____ Cook _____ in the state of _ Illinois _____ .

3. The defendant is Circana _____ , whose

street address is ___ 203 N La Salle St STE 1500 _____ ,

(city) Chicago _____ (county) Cook _____ (state) Illinois _____ (ZIP) 60601 ____

(Defendant's telephone number) ( 312 ) – 726-1221 _____

4. The plaintiff sought employment or was employed by the defendant at (street address)

203 N La Salle St STE 1500 _____ (city) Chicago _____

(county) Cook _____ (state) Illinois ____ (ZIP code) 60601 _____

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5.     The plaintiff [*check one box*]

      (a)    ☐    was denied employment by the defendant.

      (b)    ☑    was hired and is still employed by the defendant.

      (c)    ☐    was employed but is no longer employed by the defendant.

6.     The defendant discriminated against the plaintiff on or about, or beginning on or about, (month) February , (day) , (year) 2023 .

7.1    *(Choose paragraph 7.1 or 7.2, do not complete both.)*

      (a)    The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☑*has*  ☐*has not* filed a charge or charges against the defendant

          asserting the acts of discrimination indicated in this complaint with any of the

          following government agencies:

          (i)    ☑ the United States Equal Employment Opportunity Commission, on or about

               (month) June (day) 30 (year) 2023 .

          (ii)    ☑ the Illinois Department of Human Rights, on or about

               (month) August (day) 8 (year) 2022 .

      (b)    If charges *were* filed with an agency indicated above, a copy of the charge is

          attached. ☑   Yes, ☐   No, **but plaintiff will file a copy of the charge within 14 days**.

It is the policy of both the Equal Employment Opportunity Commission and the Illinois

Department of Human Rights to cross-file with the other agency all charges received. The

plaintiff has no reason to believe that this policy was not followed in this case.

7.2    The defendant is a federal governmental agency, and

      (a)    the plaintiff previously filed a Complaint of Employment Discrimination with the

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

defendant asserting the acts of discrimination indicated in this court complaint.

  ☐ Yes (month)_____ (day)_____ (year) _____

  ☑ No, did not file Complaint of Employment Discrimination

(b) The plaintiff received a Final Agency Decision on (month)_____

  (day) _____ (year) _____.

(c) Attached is a copy of the

  (i) Complaint of Employment Discrimination,

   ☐ Yes ☐ No, but a copy will be filed within 14 days.

  (ii) Final Agency Decision

   ☐ Yes ☐ N0, but a copy will be filed within 14 days.

8. *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

 (a) ☐ the United States Equal Employment Opportunity Commission has not

   issued a *Notice of Right to Sue.*

 (b) ☑ the United States Equal Employment Opportunity Commission has issued

   a *Notice of Right to Sue*, which was received by the plaintiff on

   (month)_October_____ (day)_17_____ (year)_2023_____ a copy of which

   *Notice* is attached to this complaint.

9. The defendant discriminated against the plaintiff because of the plaintiff's [*check only*

 *those that apply*]:

 (a) ☐ Age (Age Discrimination Employment Act).

 (b) ☐ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(c) ☑ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☑ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☐ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the ADA by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791; and for the ADEA, 29 U.S.C. § 626(c).

12. The defendant [*check only those that apply*]

(a) ☐ failed to hire the plaintiff.

(b) ☐ terminated the plaintiff's employment.

(c) ☐ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☑ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☑ failed to stop harassment;

(g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☑ other (specify): Conspiracy of illegal termination of employment as means of retaliation

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

4

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

_____

13.     The facts supporting the plaintiff's claim of discrimination are as follows:

Please see attachment "Complaint of Employment Discrimination - Support Fact'

_____

_____

_____

_____

14.     [*AGE DISCRIMINATION ONLY*] Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15.     The plaintiff demands that the case be tried by a jury. ☑ Yes ☐ No

16.     THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a)     ☐ Direct the defendant to hire the plaintiff.

(b)     ☐ Direct the defendant to re-employ the plaintiff.

(c)     ☑ Direct the defendant to promote the plaintiff.

(d)     ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e)     ☑ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f)     ☑ Direct the defendant to (specify): Please assign to alternative team due to harassment & retailation

Diversity, Equity and Inclusion  Program Manager was recommended that Ms. Tolbert seek promotion by

Global Prouct Team Lead. However, Plantiff is not protected on current team - Global Product Training,

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

and was denied an interview for the DEI Program Manager role in 2021 due to retaliation

(g)   ☑  If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h)   ☑  Grant such other relief as the Court may find appropriate.

_____
(Plaintiff's signature)

Jalisha Tolbert
(Plaintiff's name)

5 E 14th PL Apt 708
(Plaintiff's street address)

(City) Chicago _____ (State) IL _____ (ZIP) 60605

(Plaintiff's telephone number) ( 708 ) – 743-0313

Date: 1/10/2024

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

6

Exhibit 1

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974: See Privacy act statement<br>before completing this form.<br><br>#23N0811.02 | AGENCY<br><br>☑ IDHR<br><br>☑ EEOC | CHARGE NUMBER<br><br>2023CF0260 |
|---|---|---|

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.)<br><br>Ms. Jalisha Tolbert | | | TELEPHONE NUMBER (include area code)<br><br>708-743-0313 |
|---|---|---|---|
| STREET ADDRESS<br><br>5 E. 14th Pl Apt 708 | CITY, STATE AND ZIP CODE<br><br>Chicago, IL- 60605 | | DATE OF BIRTH<br>05/19/1988<br>MM / DD / YYYY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT<br><br>Information Resources Inc. | NUMBER OF<br>EMPLOYEES,<br>MEMBERS 15+ | TELEPHONE NUMBER (include area code)<br><br>(312) 726-1221 | |
|---|---|---|---|
| STREET ADDRESS<br><br>203 N. LaSalle St, Suite 1500 | CITY, STATE AND ZIP CODE<br><br>Chicago, IL-60601 | | COUNTY<br><br>Cook |

| CAUSE OF DISCRIMINATION BASED ON:<br><br>Disability and FMLA | DATE OF DISCRIMINATION<br>EARLIEST (ADEA/EPA) LATEST (ALL)<br>2/22/21          2/10/22<br>☑ CONTINUING ACTION |
|---|---|

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

S E E   A T T A C H E D

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION

AUG 08 2022

RECEIVED

BY:_____

**Page 1 of 2**

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true. [735 ILCS 5/1-109] |
|---|---|
| | X _____                                  8/8/22 |
| | SIGNATURE OF COMPLAINANT                    DATE |

Asha V. Mathai, Esq., M.S.W.
Rogue Employment Attorneys & Litigators (REAL), LLC
*Legal Analytics & Consulting*
Mathaiandassociates@gmail.com
Asha@rogueattorneys.com
Direct Dial: 312-783-0740

**Charge Forms**: The appropriate charge forms are attached. We would like this to be cross filed with the EEOC

## CHARGE # 1

### I. RETALIATION FOR REPORTING **RACE DISCRIMINATION**

#### A. ISSUE/BASIS: Retaliation After Reporting Race Discrimination by Respondent

    **i.** Complainant is an African American woman with a disability, namely a blood clotting disorder for which she took FMLA leave and sought accommodations for her illness, treatments, and multiple surgeries. Complainant is employed with the Respondent as **Global Product Training Consultant.**

    **ii.** Complainant filed a complaint of discrimination in in October of 2021. However, we have reason to believe that no investigation was ever conducted. Indeed, we believe that Respondent's attorney lied and falsely claimed to have investigated when there is no proof of such.

    **iii.** Respondent began to treat Complainant adversely by depriving her of a promotion, a fair evaluation and denying her an increase in pay.

    **iv.** This is in violation of state and federal law as well as in violation of the Anti-Discrimination and Anti Retaliation policy of IRI Worldwide/Respondent. When we sought the documentation identifying reasons for the denial in a promotion or pay increase, the Respondent refused to provide it. In a hearing with Officer John Detwiler of the IDHR, Mr. Detweiler agreed to obtain said documentation for us. He never did. We later received notice in July of 2022 that the claim had been dismissed for inadequate evidence, when the very evidence we needed and sought had been wrongfully and fraudulently withheld by Respondent and Officer Detwiler failed to provide the documentation that he promised to provide to us. Thus, the fact that we lack the evidence is the fault of Respondent and Officer John Detwiler (this is also why we are officially seeking review by the Human Rights Commission).

    **v.** The timeline below spells out how the Complainant's Race (Black) Disability /FMLA, as well as the date she reported the discrimination. Further it details the date Complainant was retaliated against (on 2/10/2022) when she was wrongfully and unlawfully denied a promotion or pay increase despite her stellar performance, with no explanation, because IRI/Respondent was retaliating for her engaging in her legal right to report said underlying discrimination. Please see timeline below as well as Exhibits A & B.

#### B. PRIMA FACIE ALLEGATIONS - RACE RETALIATION/DISCRIMINATION

1. On 6/7/21 during Ms. Tolbert's first team meeting after returning from medical leave, a team meeting, for unknown reasons, Mr. Magnus unilaterally elected to implement a policy of assessing my client "Ambush Style." This "Ambush style," assessment is not a style that the company had ever used previously or that is documented in the employee handbook. This created significant stress for Ms. Tolbert which we believe exacerbated her condition of DVT to PE.
2. Magnus, Gutman and Mackey agreed that they would be coming to our client training sessions **without** any prior notice to Ms. Tolbert.
3. Ms. Tolbert, responded to Magnus, the use of "Ambush style" creates a sense of fear and chaos as she was confused by this **sudden, unilateral and undocumented change in policy applied only to her.**

## Magnus, Gutman and Mackey Retaliate By Retracting Her Promotion Offer and Placing Her on Performance Improvement Plan (PIP) and Threatening Termination

1. On 6/25/2021, Mackey requested trainers to complete the "Connectors" project where quick insights about employee performance were available through Survey Monkey.
2. Connectors would allow IRI employees, clients, and Ms. Tolbert to access information like, Ms. Tolbert's performance in a clear and efficient manner *and to substantiate or disprove claims about Ms. Tolbert's performance.*
3. On 7/8/21, Gutman advised Ms. Tolbert verbally and via email "we had to call you first to let you know that you have been promoted due to all your hard-work on the PepsiCo account. Robin Smith is leaving, and I want you to take her place."
4. On 8/2/21, Mackey and Magnus requested for the STA team to upload all client contracts with as much information as possible on the 12 question MS Teams form shared.
5. On 8/2/21 Ms. Tolbert began to seek contracts after the meeting, and reached out to client teams, as this was the normal course of action prior to Mackey's request for this special project.
6. On 8/2/21 Magnus and Mackey subsequently and inexplicably removed client's access to these employee survey options resulting from the June "Connectors" project.
7. Magnus and Mackey misrepresented to staff via email that the surveys were no longer available for individual client review.
8. Between 8/2/21 – 8/4/21 Mackey and Magnus continued their preferred "Ambush" management style by reprimanding Ms. Tolbert verbally and in email regarding her record-keeping practice,
9. Mackey and Magnus were in essence advising that Ms. Tolbert was too thorough, and her contract report contained too much information because she had contacted IRI.
10. On 8/2/21, in a response to Mackey's reprimand, Ms. Tolbert explained, "I was trying to be as thorough as possible."
11. On 8/5/21, Magnus decided to provide contracts that Ms. Tolbert did not have in her possession
12. On 8/27/21 Suzanne Mackey (of Talent Acquisition) formally announced during video chat that the Global DEI Program Manager role was given to another candidate.
13. On 8/27/21, Suzanne Mackey stated, "there was concern about your lack of Program Manager experience, so we chose another candidate."
14. **On 9/7/21, Ms. Gutman assists Mr. Magnus in drawing up Ms. Tolbert's a performance improvement plan, threatening my client with termination, citing "disrespect," "lack of professionalism," and "sarcasm," as the alleged reasons for this performance plan and threatened termination.**

## Ms. Tolbert is Requesting an Investigation into Magnus's Retaliation for Denial of Promotion of Pay raise or Promotion and is a Violation of the Illinois Equal Pay Act (820 ILCS 112)

1. As you can see from attached Exhibit A, Ms. Tolbert received an employee evaluation and received top scores of 4.8 to 5.0 out of 5. Despite this, she was wrongfully denied a much-deserved promotion or increase in pay. We believe this to be a violation of the Equal Pay Act as other individuals with these scores likely would have received a raise and/or promotion where they are of Caucasian descent and/or male and/or had not taken FMLA for a chronic illness or ADA disability as Mr. Tolbert has.

2. Ms. Tolbert filed her claim for discrimination in October of 2021. IRI allegedly held an internal investigation, but never even spoke to Ms. Tolbert as part of the alleged investigation.

3. As a result, we believe Ms. Tolbert's complaint went ignored in violation of IRI's own policies and in fact that they lied about an investigation; we do not believe that an investigation was even conducted as we have yet to see any documentation of the investigation and they continue to refuse to provide it. In my 16 years of practice as an employment discrimination attorney and consultant I have never heard of a company investigating without speaking to the complainant.

4. IRI also never provided my client, Ms. Tolbert with a written acknowledgement of any investigation or the outcome. In short, we have zero proof that a proper, objective or lawful investigation was conducted in alignment with state law or their own internal policies.

5. IRI then conducted an employee evaluation of my client reflecting extremely high numerical marks (See Exhibit A) but then inexplicably refused a promotion or pay increase. We believe this to be a violation of the Illinois Equal Pay Act (**820 ILCS 122, Attached as Exhibit B**) as well as retaliation for Ms. Tolbert's October 2021 complaint that they ignored and never investigated.

6. Indeed, in keeping with this same lack of professionalism and evasive conduct, they are now refusing to do two simple things: (1) provide the documentation related to Ms. Tolbert's evaluation and (2) provide information explaining the denial of her request for explanation or pay raise.

7. We believe this denial constitutes retaliation for her discrimination complaint which was submitted in October of 2021.

8. **On February 10, 2022 the Respondent retaliated by refusing a promotion or pay increase which is clearly warranted by their own documented assessment of Ms. Tolbert reflecting extremely high ratings (Exhibit A). They refused to provide a reason or documentation to support this decision and even have wrongfully withheld and concealed it.**

9. Please also see Ms. Tolbert's written notes reflecting her own assessment of how this reflects retaliation and wrongful denial of her earned and deserved promotion and pay increase, **in violation of the Equal Pay Act, 820 ILCS 112 (Attached as Exhibit B,**
https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=2501&ChapterID=68)

# CHARGE # 2

II    RETALIATION FOR REPORTING **DISABILITY/FMLA DISCRIMINATION**

C. **ISSUE/BASIS: Retaliation After Reporting DISABILIITY/FMLA Discrimination by Respondent**

      i. Complainant is an African American woman with a disability, namely a blood clotting disorder for which she took FMLA leave and sought accommodations for her illness, treatments, and multiple surgeries. Complainant is employed with the Respondent as **Global Product Training Consultant**.

      ii. Complainant filed a complaint of discrimination in in October of 2021. However, we have reason to believe that no investigation was ever conducted. Indeed, we

believe that Respondent's attorney lied and falsely claimed to have investigated when there is no proof of such.

iii. Respondent began to treat Complainant adversely by depriving her of a promotion, a fair evaluation and denying her an increase in pay.

iv. This is in violation of state and federal law as well as in violation of the Anti-Discrimination and Anti Retaliation policy of IRI Worldwide/Respondent. When we sought the documentation identifying reasons for the denial in a promotion or pay increase, the Respondent refused to provide it. In a hearing with Officer John Detwiler of the IDHR, Mr. Detweiler agreed to obtain said documentation for us. He never did. We later received notice in July of 2022 that the claim had been dismissed for inadequate evidence, when the very evidence we needed and sought had been wrongfully and fraudulently withheld by Respondent and Officer Detwiler failed to provide the documentation that he promised to provide to us. Thus, the fact that we lack the evidence is the fault of Respondent and Officer John Detwiler (this is also why we are officially seeking review by the Human Rights Commission).

v. The timeline below spells out how the Complainant's Race (Black) Disability /FMLA, as well as the date she reported the discrimination. Further it details the date Complainant was retaliated against (on 2/10/2022) when she was wrongfully and unlawfully denied a promotion or pay increase despite her stellar performance, with no explanation, because IRI/Respondent was retaliating for her engaging in her legal right to report said underlying discrimination. Please see timeline below as well as Exhibits A & B.

## D. PRIMA FACIE ALLEGATIONS - RACE RETALIATION/DISCRIMINATION

4. On 6/7/21 during Ms. Tolbert's first team meeting after returning from medical leave, a team meeting, for unknown reasons, Mr. Magnus unilaterally elected to implement a policy of assessing my client "Ambush Style." This "Ambush style," assessment is not a style that the company had ever used previously or that is documented in the employee handbook. This created significant stress for Ms. Tolbert which we believe exacerbated her condition of DVT to PE.

5. Magnus, Gutman and Mackey agreed that they would be coming to our client training sessions **without** any prior notice to Ms. Tolbert.

6. Ms. Tolbert, responded to Magnus, the use of "Ambush style" creates a sense of fear and chaos as she was confused by this **sudden, unilateral and undocumented change in policy applied only to her.**

## Magnus, Gutman and Mackey Retaliate By Retracting Her Promotion Offer and Placing Her on Performance Improvement Plan (PIP) and Threatening Termination

15. On 6/25/2021, Mackey requested trainers to complete the "Connectors" project where quick insights about employee performance were available through Survey Monkey.

16. Connectors would allow IRI employees, clients, and Ms. Tolbert to access information like, Ms. Tolbert's performance in a clear and efficient manner **and to substantiate or disprove claims about Ms. Tolbert's performance**.

17. On 7/8/21, Gutman advised Ms. Tolbert verbally and via email "we had to call you first to let you know that you have been promoted due to all your hard-work on the PepsiCo account. Robin Smith is leaving, and I want you to take her place."

18. On 8/2/21, Mackey and Magnus requested for the STA team to upload all client contracts with as much information as possible on the 12 question MS Teams form shared.

19. On 8/2/21 Ms. Tolbert began to seek contracts after the meeting, and reached out to client teams, as this was the normal course of action prior to Mackey's request for this special project.

20. On 8/2/21 Magnus and Mackey subsequently and inexplicably removed client's access to these employee survey options resulting from the June "Connectors" project.

21. Magnus and Mackey misrepresented to staff via email that the surveys were no longer available for individual client review.

22. Between 8/2/21 – 8/4/21 Mackey and Magnus continued their preferred "Ambush" management style by reprimanding Ms. Tolbert verbally and in email regarding her record-keeping practice,

23. Mackey and Magnus were in essence advising that Ms. Tolbert was too thorough, and her contract report contained too much information because she had contacted IRI.

24. On 8/2/21, in a response to Mackey's reprimand, Ms. Tolbert explained, "I was trying to be as thorough as possible."

25. On 8/5/21, Magnus decided to provide contracts that Ms. Tolbert did not have in her possession

26. On 8/27/21 Suzanne Mackey (of Talent Acquisition) formally announced during video chat that the Global DEI Program Manager role was given to another candidate.

27. On 8/27/21, Suzanne Mackey stated, "there was concern about your lack of Program Manager experience, so we chose another candidate."

28. **On 9/7/21, Ms. Gutman assists Mr. Magnus in drawing up Ms. Tolbert's a performance improvement plan, threatening my client with termination, citing "disrespect," "lack of professionalism," and "sarcasm," as the alleged reasons for this performance plan and threatened termination.**

## Ms. Tolbert is Requesting an Investigation into Magnus's Retaliation for Denial of Promotion of Pay raise or Promotion and is a Violation of the Illinois Equal Pay Act (820 ILCS 112)

10. As you can see from attached Exhibit A, Ms. Tolbert received an employee evaluation and received top scores of 4.8 to 5.0 out of 5. Despite this, she was wrongfully denied a much-deserved promotion or increase in pay. We believe this to be a violation of the Equal Pay Act as other individuals with these scores likely would have received a raise and/or promotion where they are of Caucasian descent and/or male and/or had not taken FMLA for a chronic illness or ADA disability as Mr. Tolbert has.

11. Ms. Tolbert filed her claim for discrimination in October of 2021. IRI allegedly held an internal investigation, but never even spoke to Ms. Tolbert as part of the alleged investigation.

12. As a result, we believe Ms. Tolbert's complaint went ignored in violation of IRI's own policies and in fact that they lied about an investigation; we do not believe that an investigation was even conducted as we have yet to see any documentation of the investigation and they continue to refuse to provide it. In my 16 years of practice as an employment discrimination attorney and consultant I have never heard of a company investigating without speaking to the complainant.

13. IRI also never provided my client, Ms. Tolbert with a written acknowledgement of any investigation or the outcome. In short, we have zero proof that a proper, objective or lawful investigation was conducted in alignment with state law or their own internal policies.

14. IRI then conducted an employee evaluation and employee evaluation reflecting extremely high numerical marks (See Exhibit A) but then inexplicably refused a promotion or pay increase. We believe this to be a violation of the Illinois Equal Pay Act (**820 ILCS 122, Attached as Exhibit B**) as well as retaliation for Ms. Tolbert's October 2021 complaint that they ignored and never investigated.

15. Indeed, in keeping with this same lack of professionalism and evasive conduct, they are now refusing to do two simple things: (1) provide the documentation related to Ms. Tolbert's evaluation and (2) provide information explaining the denial of her request for explanation or pay raise.

16. We believe this denial constitutes retaliation for her discrimination complaint which was submitted in October of 2021.

17. **On February 10, 2022 the Respondent retaliated by refusing a promotion or pay increase which is clearly warranted by their own documented assessment of Ms. Tolbert reflecting extremely high ratings (Exhibit A). They refused to provide a reason or documentation to support this decision and even have wrongfully withheld and concealed it.**

18. Please also see Ms. Tolbert's written notes reflecting her own assessment of how this reflects retaliation and wrongful denial of her earned and deserved promotion and pay increase, **in violation of the Equal Pay Act, 820 ILCS 112 (Attached as Exhibit B,** https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=2501&ChapterID=68)

EEOC FORM 131-A (5/01)    U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| | JALISHA TOLBERT |

| JALISHA TOLBERT | THIS PERSON *(check one or both)* |
|---|---|
| | [X] Claims To Be Aggrieved |
| Versus | |
| INFORMATION RESOURCES INC | [ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.: 21BA30042 |
| | FEPA CHARGE NO.: 2023CF0260 |

NOTICE OF CHARGE DISCRIMINATION IN JURISDICTION WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See the enclosed for additional information)*

THIS IS A NOTICE THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act          [X] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act   [ ] The Equal Pay Act

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to _____

*(FEP AGENCY)*

[X] The          Illinois Department of Human Rights          and sent to EEOC for filing purposes.
                 *(FEP Agency)*

While EEOC has jurisdiction (upon expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may suspend its investigation and await the issuance of the Agency's final findings and orders. These findings and orders will be given weight by EEOC in making its own determination as to whether reasonable cause exists to believe that discrimination has occurred.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency will be considered by EEOC when it reviews the Agency's final findings and orders. In many cases EEOC will take no further action, thereby avoiding the necessity of an investigation by both the Agency and EEOC. This likelihood is increased by your active cooperation with the agency.

As a party to the charge, you may request that EEOC review the final findings and orders of the above-named agency. For such a request to be honored, you must notify EEOC in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by EEOC. Regardless of whether the Agency or EEOC processes the charge, the Recordkeeping and Non-Retaliation provisions of the statutes as explained in the enclosed information sheet apply.

For further correspondence on this matter, please use the charge number(s) shown above.

Enclosure(s): Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [X] DISABILITY  [X] RETALIATION  [ ] OTHER

See enclosed copy of charge of discrimination

| Date | Name/Title of Authorized Official | Signature |
|---|---|---|
| October 12, 2022 | Julianne Bowman, District Director | *Julianne Bowman* |

*Enclosure with EEOC*

*Form 131 (5/01)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charges with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notices is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

Sections 1602.14 Preservation of records made or kept. ....Where a charge...has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent...shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against the employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, or rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

EEOC Form 212-A (3/98)

# U. S. Equal Employment Opportunity Commission

TO: US EEOC, JCK Federal Building, 230 S. Dearborn
**Suite 1866 (Enforcement, State and Local & Hearings)**
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Chicago Direct Dial: (312) 872-9777
Enforcement/File Disclosure Fax: (312) 588-1260
Website: www.eeoc.gov

Date: October 12, 2022
EEOC Charge No.: 21BA30042
FEPA Charge No.: 2023CF0260

CHARGE TRANSMITTAL

SUBJECT:

| **JALISHA TOLBERT** | v. | **INFORMATION RESOURCES INC** |
|---|---|---|
| *Charging Party* | | *Respondent* |

Transmitted herewith is a charge of employment discrimination initially received by the :

☐ EEOC    ☒    Illinois Dept. of Human Rights
*Name of FEPA*

☐ Pursuant to the worksharing agreement, this charge is to be initially investigated by the EEOC.

☒ Pursuant to the worksharing agreement, this charge is to be initially investigated by the FEPA.

☐ The worksharing agreement does not determine which agency is to initially investigate the charge.

☐ EEOC Requests a waiver          ☐ FEPA waives

☐ No waiver requested          ☐ FEPA will investigate the charge initially

*Please complete the bottom portion o this form to acknowledge the receipt of the charge
and, where appropriate, to indicate whether the Agency will initially investigate the charge.*

| Typed name of EEOC or FEPA Official | Signature/Initials |
|---|---|
| James L. Bennett, Director | *James L. Bennett* |

| **JALISHA TOLBERT** | v. | **INFORMATION RESOURCES INC** |
|---|---|---|
| *Charging Party* | | *Respondent* |

TO WHOM IT MAY CONCERN:

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to initially investigate the charge.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention not to initially investigate the charge

☐ This will acknowledge receipt of the referenced charge and request a waiver of initial investigation by the receiving agency..

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to dismiss/close/not docket the charge for the following reasons:

| Typed Name of EEOC or FEPA Official | Signature/Initials |
|---|---|
| Julianne Bowman, District Director | *Julianne Bowman* |

TO: Illinois Department Of Human Rights
555 West Monroe Street
Floor 7
Chicago, IL 60661

Date: October 12, 2022
EEOC Charge No.: 21BA30042
FEPA Charge No.: 2023CF0260

Exhibit 2

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.  # 23M0726.06 | ☒ IDHR  ☐ EEOC | 2022CF1805 |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (Indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| Jalisha Tolbert | 708-743-0313 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 5 E. 14th Pl. | Chicago, IL 60605 | MM / DD / YYYY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (include area |
|---|---|---|
| Information Resources Inc. | | 312-726-1221 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 203 N. LaSalle St., Ste. 1500 | Chicago, IL 60601 | Cook |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| Retaliation | October 2021 - Present  ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

### S E E   A T T A C H E D

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION

JUL 25 2022

RECEIVED

BY:_____

Page 1 of 11

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true. [735 ILCS 5/1-109]  X_____    9/ 28 /22  SIGNATURE OF COMPLAINANT       DATE |
|---|---|

EEO-5 FORM (Rev. 5/2022-INT)

RETURN THIS COPY

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*



**It is time to demand *real* change in the workplace.**

Asha V. Mathai, Esq., M.S.W.
Rogue Employment Attorneys & Litigators (REAL), LLC
*Legal Analytics & Consulting*
Mathaiandassociates@gmail.com
Asha@rogueattorneys.com
Direct Dial: 312-783-0740

## AMENDMEND COMPLAINT WITH NOTE OF RETALIATION

March 13, 2022

**Sent Via Electronic Mail**
**Attention:**
Mallory Smith, Human Resources, Chicago, Mallory.Smith@IRIworldwide.com, 312-474 2192
Kirk Perry, Chief Executive Officer, Kirk.Perry@IRIworldwide.com, 312-474-2020
Ryan Casey, Corporate Legal/ Compliance, Ryan.Casey@IRIworldwide.com, 312-474-2622
Shelley Hughes, Vice President of Public Relations, Shelley.Hughes@IRIworldwide.com, 312-474-3675
Holly Knightly, Senior Vice President of Global Finance, Holly.Knightly@IRIworldwide.com

CC:
Illinois Department of Human Rights, IDHR.Intake@illinois.gov
Equal Employment Opportunity Commission, filed online at: https://www.eeoc.gov

**Re: Notice of FMLA, ADA, Race and Whistle-Blower Discrimination/Retaliation Claim by Jalisha Tolbert and Request for Formal Internal Investigation by IRI Worldwide- Amended March 12, 2022, for Notice of Retaliation.**

Dear Illinois Department of Human Rights and John Detwiler:

We are hereby amending our original complaint of October 2021 to add this notice of retaliation. You will find this amendment on pages 8-10, but we include the original already submitted to you and the responded for context. We thank you for your time and consideration. Please also be advised that we have an interview scheduled with Mr. John Detwiler for our original complaint of discrimination

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

against my client, Jalisha Tolbert. We were advised to file this amendment with notice of retaliation with the general intake unit which is the reason I am submitting to intake. We are hereby officially requesting that both the underlying complaint of discrimination and this notice of retaliation be consolidated and officially investigated by the same investigator. For that reason, we have cc'd Mr. Detwiler. The rest of the complaint below remains in its original form, to give you background. At the end you will note the complaint of retaliation wchi we seek an official investigation for.

## Introduction

I am writing as the legal representative of Ms. Jalisha Tolbert. Ms. Tolbert has retained me to assist in submitting a complaint of discrimination and retaliation by IRI Worldwide employees, Michael Magnus, Amy Mackey and Lynda Gutman to Human Resources as well as copied to the **Illinois Department of Human Rights (IDHR), and the Equal Employment Opportunity Commission (EEOC)** both cc'd herein. As you are likely aware, Ms. Tolbert has a documented chronic, and potentially life-threatening illness which qualifies as a disability under the ADA and for which she has taken an FMLA, and Short-Term disability Leave of absence for surgery, treatment, and recovery. While the stress resulting from the discrimination/retaliation she has suffered at IRI has exacerbated her illness, that is not necessarily the focus of this correspondence, *but we reserve the right to raise it later should it be necessary.*

Upon returning from one of her medical leaves (spanning March – May), your employees, Mr. Magnus, Ms. Gutman and Ms. Mackey engaged in discriminatory and retaliatory actions/comments against my client, Ms. Tolbert. In addition, when Ms. Tolbert reported her belief that the record-keeping and client accounting practices of IRI were insufficient, she was penalized for said whistle-blowing activity. These allegations are discussed in greater detail below.

Ms. Tolbert is a 33-year-old, African American woman, who was retaliated against two-weeks after exercising her legal right to go on leave for a documented illness of Hidradenitis Suppurativa, which synthesized with a life-threatening condition of Deep Vein Thrombosis and a Pulmonary Embolism. Ms. Tolbert exemplified her dedication to IRI when she continued to work for the 4 days following her DVT diagnosis, only to subsequently suffer an even more serious illness which was diagnosed as a Pulmonary Embolism. Ms. Tolbert's chronic illness is a disability which has been recognized under the Americans with Disabilities Act. It is my belief that the time that my client took off from work were the basis for the subsequent discrimination against my client. My client's superiors, Mr. Magnus, Ms. Mackey, and Ms. Gutman showed open hostility, intolerance complete lack of professionalism and/or basic respect toward Ms. Tolbert upon her return. They further retaliated against her for engaging in whistle-blowing activity when she identified inaccurate accounting practices. Allow me to share the troubling timeline of events below.

*Please Note: as you review the timeline below, be advised that we have all the emails and accompanying documentation to substantiate these claims. This documentation can and will be produced upon request or subpoena. We elected not to attach them at this time so as not to overwhelm the recipients or the IDHR/EEOC.*

### February 2021 – May 2021

#### Ms. Tolbert Exercises Her Legal Right to Take FMLA & Short-Term Disability from 3/22/21 - 5/23/21

1. On 2/22/21 Ms. Tolbert was Diagnosed with Deep Vein Thrombosis ("DVT").
2. Despite this extremely dangerous condition (DVT), Ms. Tolbert returned to full-time remote work 2/23/21-2/26/21

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

3. On 2/22/21 - 2/26/21- Ms. Tolbert continued to work remotely **and was unable to elevate her leg as instructed by her physician after the DVT diagnosis and thus her condition escalated**.
4. On 2/26/21 Ms. Tolbert was diagnosed with a Pulmonary Embolism ("PE").
5. 2/26/21 at 2:07pm Mackey send another email to JT regarding the non-mandatory project
6. 2/26/21 at 12:06PM CST Mackey sends an email to STA team regarding the meeting Ms. Tolbert JT was being reprimanded for delayed attendance due to the above-mentioned health crisis.
7. On 2/26/21 Stephanie Viganego gives Ms. Tolbert high praise in writing. *
8. On 3/1/21- 3/5/21 Ms. Tolbert was in an elimination Period for recovery.
9. On 3/8/21 -3/26/21 Ms. Tolbert returned to full-time remote work.
10. On 3/29/21- 5/21/21 Ms. Tolbert was Short-Term Disability (continuous).
11. On 5/24/21 Ms. Tolbert Returned to full-time remote work.

## Mr. Magnus, Ms. Mackey and Ms. Gutman Discriminated/Retaliated Against Ms. Tolbert Just *Two Weeks* After Ms. Tolbert Returned on the Basis of Disability/ADA status and her FMLA Leave

1. On 6/7/21 during Ms. Tolbert's first team meeting after returning from medical leave, a team meeting, for unknown reasons, Mr. Magnus unilaterally elected to implement a policy of assessing my client "Ambush Style."[ii]
2. This "Ambush style," assessment is not a style that the company had ever used previously or that is documented in the employee handbook. This created significant stress for Ms. Tolbert which we believe exacerbated her condition of DVT to PE.
3. Magnus, Gutman and Mackey agreed that they would be coming to our client training sessions **without** any prior notice to Ms. Tolbert.
4. Ms. Tolbert, responded to Magnus, the use of "Ambush style" creates a sense of fear and chaos as she was confused by this **sudden, unilateral, and undocumented change in policy applied only to her.**

## Magnus, Gutman and Mackey Retaliate After Ms. Tolbert Acts as A Whistle-Blower By Retracting Her Promotion Offer and Placing Her on Performance Improvement Plan (PIP) and Threatening Termination

1. On 6/25/2021, Mackey requested trainers to complete the "Connectors" project where quick insights about employee performance were available through Survey Monkey.
2. Connectors would allow IRI employees, clients, and Ms. Tolbert to access information like, Ms. Tolbert's performance in a clear and efficient manner *and to substantiate or disprove claims about Ms. Tolbert's performance*.
3. On 7/8/21, Gutman advised Ms. Tolbert verbally and via email "we had to call you first to let you know that you have been promoted due to all your hard-work on the PepsiCo account. Robin Smith is leaving, and I want you to take her place."
4. On 8/2/21, Mackey and Magnus requested for the STA team to upload all client contracts with as much information as possible on the 12 question MS Teams form shared.
5. On 8/2/21 Ms. Tolbert began to seek contracts after the meeting, and reached out to client teams, as this was the normal course of action prior to Mackey's request for this special project.
6. On 8/2/21 Magnus and Mackey subsequently and inexplicably removed client's access to these employee survey options resulting from the June "Connectors" project.
7. Magnus and Mackey misrepresented to staff via email that the surveys were no longer available for individual client review.

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

8. Between 8/2/21 – 8/4/21 Mackey and Magnus continued their preferred "Ambush" management style by reprimanding Ms. Tolbert verbally and in email regarding her record-keeping practice,
9. Mackey and Magnus were in essence advising that Ms. Tolbert was too thorough, and her contract report contained too much information because she had contacted IRI.
10. On 8/2/21, in a response to Mackey's reprimand, Ms. Tolbert explained, "I was trying to be as thorough as possible."
11. On 8/5/21, Magnus decided to provide contracts that Ms. Tolbert did not have in her possession
12. On 8/27/21 Suzanne Mackey (of Talent Acquisition) formally announced during video chat that the Global DEI Program Manager role was given to another candidate.
13. On 8/27/21, Suzanne Mackey stated, "there was concern about your lack of Program Manager experience, so we chose another candidate."
14. **On 9/7/21, Ms. Gutman assists Mr. Magnus in drawing up Ms. Tolbert's a performance improvement plan, threatening my client with termination, citing "disrespect," "lack of professionalism," and "sarcasm," as the alleged reasons for this performance plan and threatened termination.**

As noted above, Magnus supplying the contracts that Ms. Tolbert was deprived access to is an IRI violation, as this can lead to <u>wrongful transactions and inappropriate charges for clients;</u> especially if a consultant provides more training sessions than what has been contractually purchased by the client. Indeed, IRI violated its own policies as well as state and federal law by reprimanding Ms. Tolbert when she identified, "the unethical recording and analysis of the business and financial transactions associated with generally accepted accounting practices," at IRI. Magnus later scolds Ms. Tolbert for her response labeling her as "very sarcastic," and "inappropriate."

Note that **every single negative or adverse action taken against my client, Ms. Tolbert occurs after she is diagnosed with a serious illness and disability, after her medical leave and after she identifies the inaccurate accounting and documentation practices of IRI.** In short, this is discrimination and retaliation for Ms. Tolbert's disability, FMLA leave, her status as an African American woman, and her whistle-blowing activities.

## <u>Ms. Tolbert Bullied, Targeted "Ambush-Style" and Subsequently Deprived of a Promotion Because of Her Status as An African American Woman.</u>

The irony here in Mr. Magnus's scolding of Ms. Tolbert is uncanny. He is reminding my client to maintain professionalism just two months after he unilaterally implemented an "Ambush-style" assessment policy that targeted my client for no identifiable reason. It is also worth noting that Ambush style is associated with concerning war tactics used in the times of the United States Civil War, and thereby invokes disturbing racial undertones that cause understandable discomfort to my client as the only African American woman in her department. *A Caucasian man threatening an African American woman, with "ambush-style" assessments is simply not an acceptable form of communication in the workplace,* especially considering the current racial and political climate.

Ms. Tolbert also feels that she was deprived of the promotion opportunity based upon her status as an African American woman. To be clear, Ms. Tolbert has every intention of staying with the organization. This letter should not be interpreted as an indication that my client has plans of departure from the organization. Quite the contrary, she is enthusiastic about her ongoing role with IRI. Ms. Tolbert is excited to contribute to a positive and inclusive work environment, particularly for women and men of color and individuals with disabilities, particularly because she is the only black women in the entire Manufacturer Training Team. Here is a breakdown of the numbers for women and people of color within the IRI organization, which we believe is

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

the reason in part, that Ms. Tolbert was wrongfully deprived of the promotion she was so enthusiastically offered initially:

1. Ms. Tolbert the **only black woman on** the IRI Manufacturer Training Team.
2. Ms. Tolbert is **1 of 2 black women** in all of STA.
3. Ms. Tolbert is **1 of 4 minority women** in all of STA (the other 2 women are Hispanic or of Latina/o Descent).
4. Ms. Tolbert is **1 of 5 minority women** and men in all of STA.
5. There are *0* Asians, Pacific Islanders, Native African, Native American/Indigenous People, etc within the department, or STA.

These statistics showing staggering numbers for women of color are disturbing even in the absence of this discrimination/retaliation claim, but even more troublesome in combination with it. This is the type of information which if made public would reflect very poorly upon IRI Worldwide. This demonstrates that not only are African American people not represented within your company; it shows that they are held to a different standard for performance, communication style and promotion.

Further, that IRI is refusing to provide the reasoning for removing access to client survey contracts, and the reason for retracting a promotion offer Ms. Tolbert, that refusal in and of itself constitutes additional discrimination. They are withholding the very information that my client needs to defend herself against the broad and unsubstantiated claims that her communication "disrespectful," "inappropriate" and that she "lacks experience," and/or was allegedly "unprofessional." IRI is essentially protecting its right to discriminate by ignoring my client's reasonable requests for an explanation.

## Gaslighting by the IRI Perpetuates its Own Covet Racial and Disability Discrimination.

Disabled individuals like Ms. Tolbert, face significant challenges in the form of covert discrimination in overcoming not only prejudice, but, oftentimes, ignorance, as people unfamiliar with a given condition of disability may not understand what that disability entails, and how a particular condition may be accommodated so that the needs of these disabled individuals can be met in a variety of contexts. Even highly accomplished professionals like Ms. Tolbert are "gaslit" into believing that they are imagining the discrimination. Gaslighting is a term used to describe a form of narcissistic abuse to discredit its victims and make them question their reality by labeling them "difficult," "sarcastic," "crazy," or "unprofessional." Meanwhile, people like Magnus can use "Ambush style" civil war tactics to assess African American employees and face zero accountability or stigma for his openly unprofessional commentary.

Magnus, Gutman and Mackey engaged in a harassing, unprofessional, inflammatory and manner toward my client, and then, accused her of the actions that they themselves engaged in. This is a form of covert narcissistic abuse used in workplaces to way to keep employees silent, afraid, confused, and compliant. Magnus, Gutman and Mackey want my client out because this manipulation tactic and covert abuse was not effective with her. When Magnus, Gutman and Mackey were unsuccessful in this endeavor, they made sure that her promotion offer was retracted without any explanation.

As a woman, racial minority, and survivor of a congenital heart defect/open-heart surgery myself, I have lived this same discrimination, fought it, overcome it, publicized it, and have spent the last 16 years as a litigator fighting on behalf others like my client, Ms. Tolbert. Further, in my time as a litigator and employment discrimination investigator, I also obtained an M.S.W. at The University of Chicago, where I focused on the types of covert abuse committed by employers and how it can be expressed as silent and insidious hostility or discrimination against its employees. I also studied extensively the intersectionality of race, class, disability, and age discrimination because, I too have had to face this my entire professional life. I see almost all the above intersecting factors present here in the circumstances surrounding IRI's interactions with my client.

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

Using my background in social work, I have expanded my analytics and consulting practices to work with individuals who are or have suffered from this type of discriminatory abuse/treatment to help "re empower" them, advocate for equal treatment and to resolve the psychological and emotional distress/damage that this type of covert maltreatment in work environments cause to the employee. In my time as a social worker/legal consultant at the University of Chicago Medical Center, I have seen this mistake by employers at an alarming number of times. It can cause significant harm to an already oppressed population. It can result in highly negative public exposure to said organizations where they repeatedly fail to listen to their employees.

IRI's refusal to provide truthful answers regarding the "ambush-style" assessments and retraction of the promotion offer amounts to a tactic called "stonewalling," and in psychology, it is considered another very harmful form of narcissistic abuse often used with gaslighting, which surprisingly is exhibited by employers more than one might realize. I see that occurring here and it is deeply troubling.

This mistreatment is accomplished by ignoring, minimizing, and/or refusing to remedy an employee's reasonable inquiries in a position of an unequal power dynamic. An employer-employee relationship is inherently unequal, but it need not be hostile, unsafe, or discriminatory. This is silent, and thus, more dangerous, form of oppression/discrimination used by employers that often creeps under the radar because it is passive aggressive in nature and not directly addressed by case law. However, that is precisely why it is so harmful to its employees/victims.

Numerous studies have shown the stress resulting from stonewalling and gaslighting to be positively correlated to Post Traumatic Stress Disorder (PTSD) as well as other harmful physical and emotional harm. Further, in my time as a hospital-based social worker (working in the Cardiothoracic and Oncology departments at the University of Chicago Hospital) I have read study after study which shows a correlation between narcissitic abuse and exacerbated cardiac illness (like the one that Ms. Tolbert is suffering). Indeed, it seems that this is occurring here, and it does not seem unintentional or done in ignorance.

Magnus and Mackey maliciously launched a smear campaign against Ms. Tolbert with the hopes that she would resign out of fear, shame, and exhaustion. What they failed to realize is that oftentimes survivors of chronic illness are some of the most resilient, determined people they will ever meet. Such is the case with my client, Ms. Tolbert. We are prepared to exhaust every legal remedy available should the results of an internal investigation fail to remedy this misconduct. I have spelled out our goals and concerns below for your convenience.

### Ms. Tolbert is Formally Requesting an Investigation into Magnus's/Mackey's/Gutman's Racial, FMLA, ADA, Whistle-Blowing Discrimination & Retaliation.

Ms. Tolbert has simultaneously submitted a complaint for ADA/FMLA/Race/Whistle Blower Discrimination and Retaliation with Illinois Department of Human Rights (IDHR) and if needed will subsequently pursue a civil suit against IRI should they fail to provide a written response or settlement offer to the following questions within 30 days from date of this email:

1. Please confirm that during the course of this investigation Ms. Tolbert will not be required to report, receive assignments from, correspond with, or otherwise interact with Ms. Mackey, Ms. Gutman or Mr. Magnus.
2. Please provide a full and complete report as to why Ms. Tolbert was initially considered for a promotion, however, subsequently after identifying Ms. Mackey's attempt to falsify survey records and identifying Mr. Magnus's inappropriate use of the term "Ambush," she was inexplicably removed from consideration.

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

3. Ms. Tolbert would like to be in a harassment free and non-hostile work environment, where there is transparency, autonomy, and a positive team dynamic, and also all communication will be free of diminishing language that impacts her professional creditably.
4. Ms. Tolbert would like to be re evaluated for the promotion that she was wrongfully removed from consideration for.
5. Ms. Tolbert would like an equitable workload, where demands meet any reasonable ADA accommodation i.e., FTO intermittent leave, and/or reduction of client training sessions that is within a similar threshold of other teammates but does not exceed any necessary ADA accommodations.
6. Ms. Tolbert will not be "blacklisted" or unreasonably excluded from consideration for any current and/or future promotion within the STA team or any other department with IRI, as well as any 3rd party company that she seeks to continue a productive career.
7. Ms. Tolbert will be compensated fairly for taking on a leadership role as the Training Lead of PepsiCo, while maintaining several other mid-market contracts.
8. Ms. Tolbert would like to have her attorneys' fees and medical costs reimbursed for any and all fees paid in or awaiting payment for the calendar year of 2021.
9. Ms. Tolbert would like to be reconsidered for any merit-based bonuses that she was wrongfully denied in 2018, 2019 and/or 2020.

## Conclusion

In closing, rather than showing compassion or empathy during Ms. Tolbert's health crisis, Magnus, Gutman and Mackey bullied, harassed, threatened, publicly disparaged and intimidated Ms. Tolbert as she was clawing her way through a life-threatening chronic illness. Then, they had the audacity to label *Ms. Tolbert's behavior* and communication style as problematic, while refusing to address their own bullying and harassment of her. I believe that once Ms. Tolbert's supervisors realized the severity of her illness, they attempted to bully and harass her right out of the company rather than deal with the "inconvenience" that an ill employee can present to the company's bottom line. When they were unsuccessful, they upped the ante by retracting the promotion and threatening to terminate her without identifying any legitimate cause.

Sadly, many employers do not want to "deal with" the complexity of an employee struggling with a severe, chronic illness and thus attempt to run them out. The stress of their harassment, "Ambushing," and false accusations of being "disrespectful," or "unprofessional," are often to sufficient bully ill employees out the door, particularly when coupled with the exhaustion that accompanies chronic illness. **IRI management is losing its humanity and it needs to be restored.**

In light of the current social and political climate, more and more employers are seeing the necessity of promptly remedying the concerns and fears of their employees racially diverse employees and employees suffering from disabilities. Anyone, paying attention to the news sees that rapid change is no longer optional, *it is an ethical and legal requirement* for organizations that want to maintain their positive reputations. I say that as an attorney who has worked for massive organizations, the likes of Wells Fargo and Kimberly Clarke, two companies that failed to respond to their employee's complaints and suffered severe consequences as a result. That is not the result that needs to happen with IRI, and the purpose of this letter is to avoid that.

Whether or not publication of this discrimination is necessary, is now within your hands. I trust you will make the lawful and ethical decision.

Respectfully,

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

Asha V. Mathai, Esq., M.S.W.
Attorney & Employment Discrimination Consultant
Mathaiandassociates@gmail.com
Asha@rogueattorneys.com
312-783-0740

> Cc: Tom V. Mathai, Esq.
> Mathaiandassociates@gmail.com
>
> Jay Tolbert
> Jalishatolbert@gmail.com
>
> Illinois Department of Human Rights, IDHR.Intake@illinois.gov
> Equal Employment Opportunity Commission, filed online at: https://www.eeoc.gov

---

[i] During this time Ms. Tolbert could not walk but led Client Trainings for Nature's Bounty 2/23/21, Tootsie Roll 2/24/21-2/25/21. Arguably these four days of work worsened Ms. Tolbert's condition as she was supposed to keep her leg elevated and reduce stress exposure but continued to work under the pressure imposed by IRI Worldwide.

[ii] In a 2/26/21 email she praised her as, "[t]o my surprise, I haven't seen that much engagement and collaboration during a training EVER! I want to recognize Jay as a great example with how to get clients engaged during a challenging virtual world and the personalized touch that Jay brought into the training session."

[iii] This brand-new Ambush Style Assessment Policy apparently created *ad hoc* by Mr. Magnus upon Ms. Tolbert's return appears nowhere in the IRI employee handbook and to m knowledge has not been used with other employees wherein he would assess my client's performance in a self-fancied, *"Ambush Style"* during a team meeting including Brian Ackerman, Casey Shoup, Jeff Fizer, Kris Daly as well as Michael Magnus and my client, Ms. Tolbert.

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

## AMENDMENT – RETALIATION

### Ms. Tolbert is Requesting an Investigation into Magnus's Retaliation for Denial of Promotion of Pay raise or Promotion and is a Violation of the Illinois Equal Pay Act (820 ILCS 112)

We are hereby amending this complaint to now include a claim of retaliation. As you can see from attached Exhibit A, Ms. Tolbert received an employee evaluation and received top scores of 4.8 to 5.0 out of 5. Despite this, she was wrongfully denied a much-deserved promotion or increase in pay. We believe this to be a violation of the Equal Pay Act as other individuals with these scores likely would have received a raise and/or promotion where they are of Caucasian descent and/or male and/or had not taken FMLA for a chronic illness or ADA disability as Mr. Tolbert has. As you can see from this timeline:

1. Ms. Tolbert filed her claim for discrimination in October of 2021. IRI allegedly held an internal investigation, but never even spoke to Ms. Tolbert as part of the alleged investigation.
2. As a result, we believe Ms. Tolbert's complaint went ignored in violation of IRI's own policies and in fact that they lied about an investigation; we do not believe that an investigation was even conducted as we have yet to see any documentation of the investigation and they continue to refuse to provide it. In my 16 years of practice as an employment discrimination attorney and consultant I have never heard of a company investigating without speaking to the complainant.
3. IRI also never provided my client, Ms. Tolbert with a written acknowledgement of any investigation or the outcome. In short, we have zero proof that a proper, objective or lawful investigation was conducted in alignment with state law or their own internal policies.
4. IRI then conducted an employee evaluation of my client on 2/10/2022 reflecting extremely high numerical marks (See Exhibit A) but then inexplicably refused a promotion or pay increase. We believe this to be a violation of the Illinois Equal Pay Act (820 ILCS 122, **Attached as Exhibit B**) as well as retaliation for Ms. Tolbert's October 2021 complaint that they ignored and never investigated.
5. Indeed, in keeping with this same lack of professionalism and evasive conduct, they are now refusing to do two simple things: (1) provide the documentation related to Ms. Tolbert's evaluation and (2) provide information explaining the denial of her request for explanation or pay raise.
6. We believe this denial constitutes retaliation for her discrimination complaint which was submitted in October of 2021. Now just about 4 months later, they have the audacity to refuse a promotion or pay increase which is clearly warranted by their own documented assessment of Ms. Tolbert reflecting extremely high ratings (Exhibit A).
7. Please also see Ms. Tolbert's written notes reflecting her own assessment of how this reflects retaliation and wrongful denial of her earned and deserved promotion and pay increase, **in violation of the Equal Pay Act, 820 ILCS 112 (Attached as Exhibit B,** https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=2501&ChapterID=68)

We ask that IDHR perform an official investigation into this retaliation and violation of the Equal Pay Act. We further ask the IDHR demand proof that an investigation was even conducted. Finally, we ask for the following documents:

- The Tolbert Balance Scorecard Year-End Review (all benchmarks that are rated across the board)
- Final Performance Rating (Overall rating that impacts Ms. Tolbert's salary increase and bonus)

*J. Tolbert v. IRI Worldwide, October 2021- Amended for Retaliation Complaint, March 12, 2022*

Respectfully submitted,
Asha V. Mathai, Esq., M.S.W.
Attorney & Employment Discrimination Consultant
Mathaiandassociates@gmail.com
Asha@rogueattorneys.com
312-783-0740


Cc: Tom V. Mathai, Esq.
Mathaiandassociates@gmail.com

Jay Tolbert
Jalishatolbert@gmail.com

EEOC FORM 131-A (5/01)     U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| | **JALISHA TOLBERT** |
| JALISHA TOLBERT | THIS PERSON *(check one or both)* |
| | [X] Claims To Be Aggrieved |
| Versus | |
| | [ ] Is Filing on Behalf of Other(s) |
| INFORMATION RESOURCES INC | |
| | EEOC CHARGE NO.: 21BA20941 |
| | FEPA CHARGE NO.: 2022CF1805 |

**NOTICE OF CHARGE DISCRIMINATION** IN JURISDICTION WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See the enclosed for additional information)*

THIS IS A NOTICE THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act        [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act        [ ] The Equal Pay Act

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to

*(FEP AGENCY)*

[X] The ___Illinois Department of Human Rights___ and sent to EEOC for filing purposes.
*(FEP Agency)*

While EEOC has jurisdiction (upon expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may suspend its investigation and await the issuance of the Agency's final findings and orders. These findings and orders will be given weight by EEOC in making its own determination as to whether reasonable cause exists to believe that discrimination has occurred.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency will be considered by EEOC when it reviews the Agency's final findings and orders. In many cases EEOC will take no further action, thereby avoiding the necessity of an investigation by both the Agency and EEOC. This likelihood is increased by your active cooperation with the agency.

As a party to the charge, you may request that EEOC review the final findings and orders of the above-named agency. For such a request to be honored, you must notify EEOC in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by EEOC. Regardless of whether the Agency or EEOC processes the charge, the Recordkeeping and Non-Retaliation provisions of the statutes as explained in the enclosed information sheet apply.

For further correspondence on this matter, please use the charge number(s) shown above.

Enclosure(s): Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination**

| Date | Name/Title of Authorized Official | Signature |
|---|---|---|
| September 29, 2022 | Julianne Bowman, District Director | *Julianne Bowman* |

*Enclosure with EEOC*

*Form 131 (5/01)*

## INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charges with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notices is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

Sections 1602.14 Preservation of records made or kept. ....Where a charge...has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent...shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against the employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, or rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy Instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

EEOC Form 212-A (3/98)

## U. S. Equal Employment Opportunity Commission

TO: US EEOC, JCK Federal Building, 230 S. Dearborn
**Suite 1866 (Enforcement, State and Local & Hearings)**
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Chicago Direct Dial: (312) 872-9777
Enforcement/File Disclosure Fax: (312) 588-1260
Website: www.eeoc.gov

Date: September 29, 2022
EEOC Charge No.: 21BA20941
FEPA Charge No.: 2022CF1805

CHARGE TRANSMITTAL

SUBJECT:

| **JALISHA TOLBERT** | v. | **INFORMATION RESOURCES INC** |
|---|---|---|
| *Charging Party* | | *Respondent* |

Transmitted herewith is a charge of employment discrimination initially received by the :

| | EEOC | X | Illinois Dept. of Human Rights |
|---|---|---|---|

*Name of FEPA*

[ ] Pursuant to the worksharing agreement, this charge is to be initially investigated by the EEOC.

[X] Pursuant to the worksharing agreement, this charge is to be initially investigated by the FEPA.

[ ] The worksharing agreement does not determine which agency is to initially investigate the charge.

[ ] EEOC Requests a waiver [ ] FEPA waives

[ ] No waiver requested [ ] FEPA will investigate the charge initially

*Please complete the bottom portion o this form to acknowledge the receipt of the charge
and, where appropriate, to indicate whether the Agency will initially investigate the charge.*

| Typed name of EEOC or FEPA Official | Signature/Initials |
|---|---|
| James L. Bennett, Director | *James L. Bennett* |

| **JALISHA TOLBERT** | v. | **INFORMATION RESOURCES INC** |
|---|---|---|
| *Charging Party* | | *Respondent* |

TO WHOM IT MAY CONCERN:

[ ] This will acknowledge receipt of the referenced charge and indicate this Agency's intention to initially investigate the charge.

[ ] This will acknowledge receipt of the referenced charge and indicate this Agency's intention not to initially investigate the charge.

[ ] This will acknowledge receipt of the referenced charge and request a waiver of initial investigation by the receiving agency..

[ ] This will acknowledge receipt of the referenced charge and indicate this Agency's intention to dismiss/close/not docket the charge for the following reasons:

| Typed Name of EEOC or FEPA Official | Signature/Initials |
|---|---|
| Julianne Bowman, District Director | *Julianne Bowman* |

TO: Illinois Department Of Human Rights
555 West Monroe Street
Floor 7
Chicago, IL 60661

Date: September 29, 2022
EEOC Charge No.: 21BA20941
FEPA Charge No.: 2022CF1805

Exhibit 3

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S. Dearborn Street
Chicago, Illinois 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 10/17/2023

**To:** Jalisha Tolbert
5 E. 14th Place
Chicago, IL 60605

**Charge No: 21B-2022-00941**

EEOC Representative and email:

Sherice Galloway
Manager / State, Local & Tribal
sherice.galloway@eeoc.gov

## DISMISSAL OF CHARGE

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On Behalf of the Commission:

Digitally Signed By:Diane Smason
10/17/2023

Diane Smason
Acting District Director

**Cc:**

INFORMATION RESOURCES, INC.
c/o Kyla J. Miller, Esq.
Seyfarth Shaw, LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606

Exhibit 1

# EEOC (Inquiry) Number: **440-2023-07326**

## Inquiry Information

### INQUIRY OFFICE

**Receiving:** Chicago District Office

**Accountable:** Chicago District Office

### POTENTIAL CHARGING PARTY

**Name:** Ms. Jalisha Tolbert

**Address:** 5 E 14th Pl 708
CHICAGO, IL 60605

**Year of Birth:**

**Email Address:** jalisha.tolbert@gmail.com

**Phone Number:** 708-743-0313

### POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** F

**Disabled?** I have a disability

**Are you Hispanic or Latino?** not hispanic or latino

**Ethnicity:** Black or African American,

**National Origin:** American(U.S.)

### RESPONDENT/Employer

**Organization Name:** Circana

**Type of Employer:** Business or non-profit organization that I applied to, work for, or worked for

**Number of Employees:** 20 or more employees

**Address:** 203 N LA SALLE ST STE 1500
CHICAGO, IL 60601

**County:** Cook

**Phone Number:**

### LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

**Address:**

**County:**
## RESPONDENT CONTACT

**Name:** Circana

**Email Address:** Human.Resources@circana.com

**Phone Number:**

**Title:**

## REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 06/08/2023

**Reason for Complaint:** Disability, Retaliation - I filed a charge of job discrimination about any of the above, Retaliation - I complained to my employer about job discrimination

**Pay Disparity:**

**Location of Incident:** Illinois

**Submission (initial inquiry) Date** 06/12/2023

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:**

**Charge Number:** 440-2023-07326

**Claim previously filed as complaint with another Agency?** Yes

**Agency Name:** IDHR

**Approximate Date of Filing:** 10/12/2021

**Nature of Complaint:** Harassment, Job Discrimination, and Disability Discrimination

## Adverse Action(s)

6/8/23, Lucy Czech refused my request to be notified at least 7 days before a Formal Observation as to mitigate undue stress and anxiety that has previously triggered my physical disability. Czech executed a Formal Observation despite my request. On 6/7/23 I emailed, ?I would like to receive minimum of 7 days prior to a formal observation as to reduce any opportunity to trigger anxiety or my disability. If you would like me to begin a reasonable accommodation request with HR, I can do so to ensure that we are aligned with my personal needs to succeed in this role.? She understood the request to not be blind sighted by a Formal Observation that would count against my Year-End Review, Salary, and Merit Bonus. I was unable to perform at my highest capacity; therefore, the adverse reaction is a loss of salary increase, negative impact on future opportunities due to subjective benchmarks by management, and the loss of ?High Rating? Merit Bonus and its monetary value.

## APPOINTMENT

**Appointment Date and time:** 10/25/2023 13:00:00 CST

**Interview Type:** InOfficeByVideo
**APPROXIMATE DEADLINE FOR FILING A CHARGE:** 04/03/2024
## Supplemental Information

## What Reason(s) were you given for the action taken against you?

Lucy Czech was written via email on 6/8/23 immediately that the ambush style Formal Observation would cause undue stress and anxiety and would trigger my physical disability. Despite my request for a reasonable accommodation on 6/7/23 and the morning of 6/28/23, I was forced to train over 33 leaders, executives, and interns for one of the biggest companies in the world, Unilever with less than 24 hours to mental and physically prepare myself for a daunting task. Lucy refused my request for reasonable accommodation on a matter that has no physical cost to our company Circana (formerly known as Information Resources Inc. -IRI).

Under the ADA, it states, ?As a practical matter, it may be in an employee's interest to request a reasonable accommodation before performance suffers or conduct problems occur?. I did what the law deems as a practical matter by notifying management and Human Resources before ?performance suffers?, and my request was denied.

On 6/12/23, during 1-on-1 biweekly meeting, Lucy provided written and verbal feedback that included negative remarks that caused in real-time triggered my PTSD anxiety symptoms including nausea, rapid heartbeat, feelings of fear, and yet she had no compassion. Her remarks and scores were well below performance output taken in previous years i.e. 2021, 2020, 2019, etc. She subjectively scored me 83.87% below the passing threshold of 90% benchmark set by management. She stated that going forward all trainers will be notified only the day before. I explained that she is not taken into account my disability and needs while navigating a stressful role for major players at a Fortunate 100 company. She showed no compassion and said nothing would change for me and that I ?shouldn?t have anxiety? because ?all trainers will go through this?. As though my individual nature, aptitude, and disability necessities should be discounted; she ignored my verbal and written disability request to not participate in a work activity that causes detriment to my mental and physical health.

After the 1-on-1 meeting, Lucy sent an email stating ?We will continue to provide a notice the day before trainings for all trainers?? Again, Czech ?ignores? my request for a Reasonable Accommodation for third time in a 5-day span. Please note: It has been well documented that I have an employee with disability. I have emailed this several times in prior months directly to Lucy Czech. Therefore, she is fully aware that employees who request reasonable accommodations that do not cause undue stress to the business, should be respected so that the employee can successfully perform it?s role. I have been refused this opportunity.

## Was anyone in a similar situation treated the same, better, or worse than you?

Glen Brownson was given adequate notification that he would have be observed by management, Lucy Czech during this previous training sessions in 2023.

In previous years, I was given 1-2 week notice minimum when management would be conducting a Formal Observation. This was standard practices for my entire team (Omar Marrero, Sonya Goff, Karen Egri, and myself). Lucy Czech joined this team February 2023 as the Client Training Manager. She had served on my team prior to 2020, and she was a unilateral teammate at the time, who underwent the same Formal Observations from other managers i.e. Lynda Gutman, Michael Magnus, Amy Mackey.

Therefore, she is aware of what standard practices would be for my team and the entire organization. However, she and the other managers have decided to take an "ambush" approach by only telling trainers the day before that they will be scoring them for the Year-End Review via Formal Observation. This causes extreme anxiety and triggers my physical disability.

## Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this personwill provide.

## Please <u>tell us any other information about your experience?</u>

Precipitating Events: All Client Product Training Team Managers have been aware of my disability from an on-going investigation where a potential job offering was rescinded after a several months on short-term disability from a life-threatening occurrence. In Feb. 2021, I was diagnosed with DVT (blood clot in calf), where I expected to continue to train a new implementation (Tootsie Roll), sat multiple days for 3 hours at a time, within 5 days, the blood clot shattered and logged into my lungs causes me to spittle blood all night and go to the ER to be diagnosed with a Pulmonary Embolism. I needed to have my legs elevated as I just begun blood-thinners, this led to months out of work going to a clinic 3 days per week, walking on a cane, and the loss of nerve functions in my leg. I returned to be continuously mistreated. This was documented and given to the IDHR in 2021 and 2022.

My initial request on 6/7/23 for reasonable accommodation was denied on 6/8/23 when Lucy Czech forcibly conducted a formal Observation despite my 3 requests for her not to do so, due to heightened anxiety. Moreover, all future request for advance notice of Formal Observation have been denied as stated in her email. Czech states via email ?I?m informing all trainers of the observation the day prior, and this will continue to be the method of operation?.

Lucy Czech has refused to ?modify a workplace policy? that is necessitated by my individual-related limitations. I requested 7 days minimum notification as this has been the policy during previous Formal Observation by Training Management. In this capacity, I was able to mental prepare for an observation that impacts my salary and bonus structure.

https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under ada#requesting

Exhibit 5

## Complaint of Employment Discrimination - Supporting Facts

13. The facts supporting the plaintiff's claim of Discrimination and Retaliation are as follows:

---

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, or rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

---

The following statement is supplemental materials to conclusive show how Circana Management has continued coordinated efforts of Retaliation against the plaintiff, Ms. Jalisha Tolbert. According Section 704(a) of Title vII, Section 4(d) of the ADEA and **Section 503 (a) of the ADA that is an unlaw employment practice for an employer to discriminate against present or former employee or job applicants, for an employment agency to discriminate against any individual,** or for a union to discriminate against its members or applicants for membership, **because they have opposed any practice made an unlawful employment practice by the statues or because they have made a charge, testified, or assisted, or participated in any manner in an investigation, proceeding, or hearing under the statues.** The Equal Pay Act contains similar provisions. **Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, or rights under the Act.**

*Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.*

### Introduction:

The Plaintiff Ms. Tolbert has filed several complaints of discrimination, harassment, and retaliation with the IDHR and EEOC from 2021-2023. As a result, the EEOC determined Ms. Tolbert has the Right to Sue, the employer, Circana for multiple incidents of adverse actions that

led to a dramatic decline in her physical and mental health. The following will showcase how Circana has tried to illegally terminate as means of retaliation due to the on-going investigations. Ms. Tolbert cites experiencing a hostile work environment, harassment, and retaliation due to disability discrimination. Ms. Tolbert informed Reivis Barileau, IDHR Investigator II, of the continuous acts of Retaliation committed by Circana management as means to threaten her employment, interfere with job opportunities i.e. 2023 Growth Summit (a professional development conference), intimidation tactics by reducing standard test scores around 'Formal Training Observations', means and altering standard operating procedures as to inflict emotional harm. These actions occurred after the initial charge form was shared with the EEOC in 2022 citing injuries endured from 2021 thru 2022. Moreover, these are consequential adverse actions of Retaliation that Ms. Tolbert endured until her health began to fail yet again due to emotional distress in 2023. Ms. Tolbert shared these facts with Reivis Barileau, Human Rights Investigator II of Illinois Department of Human Rights (IDHR) on March 19, 2023 and March 21, 2023. As standard practice, the IDHR should have copied and shared these acts of Retaliation with the EEOC as noted within the agency's statutes. Additionally, supplemental evidence shows below that Circana continued to retaliate in June-August 2023 during job testings, reviews, and finally led to the conspiracy to illegally terminate a protected citizen under the Civil Rights Act and ADA.

### Americans Disability Act 1990 (ADA)

https://www.eeoc.gov/statutes/titles-i-and-v-americans-disabilities-act-1990-ada
SEC. 12112. [Section 102]

*(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, **advancement,** or discharge of employees, employee compensation, job training, and other terms, conditions, **and privileges of employment.***
- Ms. Tolbert was denied the privileges of employment when she was the only U.S Client Training Consultant excluded from attending the Circana Growth Summit in March 2023.

*b) Construction. - As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes-*

*(1) **limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;***
- Ms. Tolbert was segregated from all other U.S. Client Training Consultants during the 2023 Growth Summit several days in  March 2023. She is excluded from attendance 3 months after a conference with Ms. Reivis Barileau, of the IDHR, Circana, and its attorneys. During this conference Ms. Tolbert explained all the acts of discrimination that occurred between 2021-2022. Upon dismissal of the IDHR charges, Circana used multiple tactics to retaliate against Ms. Tolbert where they excluded her from this professional development conference - Growth Summit as to stifle her career growth and trajectory.

*(4) **excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;***

- Ms. Tolbert was recommended by Circana management for Job Promotion for a DEI Program Manager role, only to be rescinded after short-term disability and a whistleblower complaint.

*(5) (A) **not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee**, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or*

- HR refused to reasonably accommodate Ms. Tolbert, when she requested 7 days notice minimum before undergoing Formal Training Observation from management. Ms. Tolbert cited anxiety, racing heart palpitations, as she had experienced adverse actions from multiple members of Circana management. Benefits refused to fully accommodate Ms. Tolbert, instead she was blind-sighted less than 24 hours before an over capacity training session with a Fortune 500 client. This caused major emotional distress, and led to a lower score than she would have received during previous observation.

*(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;*

*(6) **using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities** unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and **is consistent with business necessity***

- Ms. Tolbert showcased that administering an employment test i.e 'Formal Training Observation' conducted in June 2023 is NOT consistent with business necessity. The last formal observation conducted for Ms. Tolbert with management occurred in 2021 and Ms. Tolbert was given at least 2 weeks notice before any given 'Formal Training Observation'. Standard Operating procedures for training consultant observations were set at an agreed upon date, and is the standard for any review that impacts annual salary compensation and marital bonus structure. Prior to 2021, Ms. Tolbert traveled to most client sites to consult them onsite at their respective corporate headquarters, thus her role is one of autonomy. Therefore to administer a 'Formal Training Observation', Circana management would have to book a flight and hotel accommodation after the employee informs them of the date and time in consideration. Finally, the employee would send all pertinent information so that the test i.e 'Formal Training Observation' could be administered in-person. This conclusive evidence shows that Circana went against standard practices for screening/ testing Ms. Tolbert in June 2023.

*(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).*

- Circana failed to select and administer tests concerning employment in the most effective manner, when they rejected Ms. Tolbert's Reasonable Accommodation to be notified at least 7 days prior to any 'Formal Training Observation'. This requested accommodation would still be less time than she received in the past during which management was required to travel onsite to conduct a 'Formal Training Observation' within a corporate office. Ms. Tolbert was reasonable in requesting the accommodation that would not cause an undue burden or financial impact to the company, Circana.

**Enforcement:**
*(a) AMERICANS WITH DISABILITIES ACT OF 1990. - The amendments made by section 3 [Lilly Ledbetter Fair Pay Act of 2009, PL 111-2, 123 Stat. 5] shall apply to claims of discrimination in compensation brought under title I and section 503 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq., 12203), pursuant to section 107(a) of such Act (42 U.S.C. 12117(a)), which adopts the powers, remedies, and procedures set forth in section 706 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5).*

- As a result, Ms. Tolbert is seeking the maximum in damages due to emotional harm inflicted including compensatory and punitive damages, court fees, administrative cost, attorney fees, and all other damages as seen lawful by the court.

**Background - February/ March 2023: Disparate Treatment for Employee with Disability**
Despite the on-going investigation against former manager, Michael Magnus. Circana rebranded from information resources Inc, and decided to recruit a former Client Trainer, Lucy Czech. She started role as Client Training Manager of the Global Product Training Department February 2023, after Micheal Magnus (previously investigated Client Training Manager) was moved to a new role "Training Special Projects Manager".

On 3/21/23, Ms. Tolbert emailed team members looking for rebranded Training Decks as Information Resources Inc. had gone through a merger with NPD and renamed the company Circana. Ms. Tolbert sent out a team email asking if materials had been posted in a shared folder. Unfortunately, Ms. Tolbert learns that she has been yet again isolated and ostracized from her teammates, after receiving automatic notifications that all Client Trainers were Out Of Office (OOO) and attending 2023 Growth Summit. This is a major annual conference for professional development amongst clients and employees of Circana. Ms. Tolbert documents that is discriminatory to invite her entire team, and yet exclude her from a career growth opportunity as she is a known employee with disability. Ms. Tolbert was the only U.S based Client Trainer that was not invited nor attended Circana's only major Professional Convention of

the year "Growth Summit". This was an all-expense paid trip to Las Vegas, NV, where professional development is offered to clients and employees of the company. This was not only embarrassing to be excluded and not invited, but blatant discrimination based upon the following email from leadership. As a result, Ms. Tolbert had to manage the burden of updating multiple training presentations as all U.S Based Global Product Client Training Consultants were out of office including: Sonya Goff, Omar Marrero, and Karen Egri. In addition, all department managers and leaders attended the Growth Summit including Lucy Czech (hired as Client Training manager February 2023), Amy Mackey (Department/ Team Lead), Lynda Gutman (LMS Manager), and Michael Magnus (former Client Training Manager/ current "Training Special Projects Manager" - New Role)

## Summary of February-March 2023 Retaliation

Overall, Ms. Tolbert experienced *disparate treatment* from management, which is a form of discrimination. Ultimately, they chose to retaliate by excluding Ms. Tolbert from Professional Workshops and Events, while all other unilateral employees on my team were rewarded with an invitation to Summit. This is an adverse action to my initial complaint. There is documented OOO automated response and pictures for all team members that attended the 2023 Growth Summit.

> *"Disparate treatment occurs when an employer treats an applicant or employee less favorably than others who are similarly situated, and the different treatment is because of the person's race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran.* **"**
> **https://www.dol.gov/sites/dolgov/files/ofccp/regs/compliance/factsheets/FACT_Workplace_Aug2016_ENGESQA508c.pdf**

## Global Product Training Team Summit Attendance (for Global Product Client Training Team Only)

- **Global Product Management:** Amy Mackey, Michael Magnus, Lynda Gutman, Lucy Czech - confirmed to be at 2023 Growth Summit (Management for the Global Product Training Dept) 3 out 3 managers attended - 100%
- **U.S Based Client Training Consultants:** Sonya Goff, Omar Marrero, Karen Egri - confirmed to be at 2023 Growth Summit (Lucy Czech Team) - 3 out 4 Consultants attended - 75%
  - Excluded from the US. Based Client Training Consultant - Jalisha Tolbert, the Plaintiff, did not attend the 2023 Growth Summit 1 out 4 - 25%
- **International Based Client Training Consultant**: Glen Brownson, who is February 2023 new hire, did not confirm that he was invited to Summit.
  - (Please note: He is based in an international location -Spain*). 1 out 1 - 100% international Client Training consultant did not attend

**Note:** Therefore, Ms. Tolbert was the only Client- Facing Training Consultant that was in office within the U.S. Territory. From March 20th - 22nd, 2023. Therefore, Ms. Tolbert was responsible

for all functions of client training while her entire U.S. Based Client Training Team were out-of-pocket enjoying an all expense paid trip to Las Vegas to entertain clients, enjoy professional development, and networking opportunities.

### June 2023 - Retaliation - Disability Discrimination

Lucy Czech was notified via email on 6/8/23 immediately that the "Ambush" style Formal Observation would cause undue stress and anxiety, which in effects, triggers Ms. Tolbert physical disability. Despite Ms. Tolbert request for a Reasonable Accommodation on 6/7/23 and the morning of 6/28/23, Ms. Tolbert was forced to train over 33 leaders, executives, and interns for one of the biggest companies in the world, Unilever, with less than 24 hours to mentally and physically prepare Ms.Tolbert for a daunting task. Czech refused her request for reasonable accommodation on a matter that has no physical cost to the company Circana (formerly known as Information Resources Inc. -IRI/Circana).

*Under the **ADA, it states, "As a practical matter, it may be in an employee's interest to request Reasonable Accommodation before performance suffers or conduct problems occur".** Ms. Tolbert did what the law deems as a practical matter by notifying management and Human Resources before "performance suffers", and yet Ms. Tolbert's request was denied.*

On 6/12/23, during a 1-on-1 biweekly meeting, Lucy Czech provided written and verbal feedback that included negative remarks that caused in real-time triggered Ms. Tolbert's PTSD anxiety symptoms included nausea, rapid heartbeat, feelings of fear, and yet Czech had no compassion. Ms. Tolbert's remarks and scores were well below performance output taken in previous years i.e. 2021, 2020, 2019, etc. Czech subjectively scored Ms. Tolbert 83.87% below the passing threshold of 90% benchmark set by management.

Czech stated that going forward all trainers will be notified only the day before a 'Formal Training Observation'. Ms. Tolbert explained that she is not taking into account her disability and needs while navigating a stressful role for major players at a Fortune 500 company. Czech showed no compassion and said *"nothing would change for you"* and that, *"you shouldn't have anxiety because all trainers will go through this"*. As though Ms. Tolbert's individual nature, aptitude, and disability necessities should be discounted; Czech ignored her verbal and written disability request to not participate in a work activity that causes detriment to Ms. Tolbert mental and physical health.

After the 1-on-1 meeting, Lucy Czech sent an email stating "We will continue to provide a notice 1 day before training for all trainers" Again, Czech ignored Ms. Tolbert's request for a Reasonable Accommodation for the third time in a 5-day span.

Please note: It has been well documented that Ms. Tolbert is an employee with a disability. As Ms. Tolbert has emailed this several times in the prior months directly to Lucy Czech. Therefore, she is fully aware that employees who request reasonable accommodations that do not cause

undue stress to the business, should be respected so that the employee can successfully perform her role. Ms. Tolbert has been denied this opportunity of success.

Ms. Tolbert's initial request on 6/7/23 for Reasonable Accommodation was denied on 6/8/23. Lucy Czech forcibly conducted a formal Observation despite the employee requesting three times for Czech not to do so, due to heightened anxiety. Moreover, all future requests for advance notice of Formal Observation have been denied as stated in Lucy Czech response email. Czech states via email "I'm informing all trainers of the observation the day prior, and this will continue to be the method of operation". Lucy Czech has refused to "*modify a workplace policy*" that is necessitated by my individual-related limitations. Ms. Tolbert requested 7 days minimum notification as this has been the policy during previous Formal Observation by Training Management. In this former capacity, Ms. Tolbert was able to mentally prepare for an observation that impacts her overall annual salary and merit-based bonus structure. Despite the request for Reasonable accommodation, Ms. Tolbert was denied by the Benefits Team and Global Product Training management. In addition, Ms. Tolbert requested on several occasions to be assigned to an Employee Advocate. This request was ignored and Ms. Tolbert had to continue to suffer in silence while being stonewalled by HR.

As a result, Ms. Tolbert was forced into the ambushed style Formal Training observation on 6/8/23 as well as a subsequent 1-on-1 review with Lucy Czech on 7/24/23. Lucy Czech scheduled a meeting to discuss Ms. Tolbert's 2023 Mid-Year Review. Where Czech was seen on camera wearing an all black hoodie *(atypical attire for a professional zoom meeting)*. During the first 10 minutes of the meeting Czech explained 360 feedback from cross-functional employees, and stated that they only provided positive feedback as Ms. Tolbert performed well as a Trainer and has excellent client survey scores and written praise from clients and employees. After summarizing all metrics that can be aggregated from survey data, Lucy Czech unleashed a hurdle of offensive and berating comments, when Ms. Tolbert asked if she could move on, she began yelling offensive slurs and would not stop harassing Ms. Tolbert's character. This conversation was not constructive feedback, but instead an attempt to silence Ms. Tolbert while her manager spewed verbal abuse and thus creating a hostile work environment.

When Ms. Tolbert asked for Czech to move onto another work objective, Czech refused and said **"*You SLANDER leadership. If you want to end the call, then go ahead, but I will continue to say that you are a NEGATIVE person and make this company look BAD!*"** Ms. Tolbert asked Czech to please provide written feedback via email, as she could no longer endure the verbal abuse as she began "***experiencing extreme anxiety (nausea, rapid heartbeat, headaches, and crying) because this behavior is no different than what I [plaintiff] endured for years with Mike [Magnus] and Amy [Mackey]*"**. Ms. Tolbert experienced an Anxiety Attack, so severe that she had to take 3 days of Sick-Time Off to redeem her mental and physical stability. This resulted in a loss of needed Sick-Time Off Benefits. Ms. Tolbert went days without pay when she began short term disability on 8/16/23 for two scheduled major surgeries. This is documented medically as well as with Ms. Tolbert

Certified Therapist/ Social Worker. Upon her return, Ms. Tolbert informed HR that she no longer felt safe on her team, especially when having 1-on-1 meetings with management and having no Employee Advocate present.

All in all, Ms. Tolbert did experience discrimination in March 2023, when All U.S Global Product Client Training Consultants attended the Growth Summit. In fact, she was the only U.S based Client Trainer that was not invited to Las Vegas. This is heavily documented. Ms. Tolbert did reach out to Lucy Czech for comments as to why this would be appropriate, and she referred her to Amy Mackey. Again, during this time, Amy Mackey was under investigation by IDHR as a co-conspirator for Michael Magnus.

### July 2023 - Retaliation and Conspiracy to Illegally Terminate Employment
On 7/31/23, Ms. Janice Ippolito, HRBP, held a meeting with Ms. Tolbert to document her complaint of retaliation and gather details of the events that took place on 7/24/23; during the formal observation feedback meeting between Czech and Ms. Tolbert. After reiterating details that were shared via email in the prior days, Ippolito promised to look into the matter further. However, by the next day, 8/1/23, Ms. Tolbert learns that her Employee Account/ Lan ID had been disabled from IT Support Specialist, Vinay. This takes place an hour before a scheduled training with Ocean Spray. HR emailed and cited, **"***We have received the request from Daelen Kenney that Jalisha Ms. Tolbert (LAN ID: CSJYT) was* **mistakenly offboarded on 7/31***.*"**

Please note: **Daelen Kenney's role is HR Operations**, therefore someone within HR submitted a request for Ms. Tolbert and her associated LAN ID: (CSJYT) to be offboarded aka "disabled". Therefore, Ms. Tolbert could not train Ocean Spray as scheduled from 9a-12p CST. This caused Ms. Tolbert another anxiety attack as she has been dedicated to this account for almost 5 years, and this has never happened within her 7 year career at Circana. **For the first time ever upon logging off VPN on the evening of 7/31/23, Ms. Tolbert was "offboarded" by someone within the HR Department on the same day that she had a meeting with the Director of HR, Janice Ippolito 7/31/23 at 12pm CST. Remember this meeting was to report a complaint of Retaliation and Hostile Work Environment created during the Mid-year Review meeting with Lucy Czech on 7/24/23.**

Ms. Tolbert had been blind-sighted and unknowingly HR began the steps for an unannounced "Illegal Termination" of an employee with a disability, who requested FMLA paperwork 2 weeks prior to this event and a Reasonable Accommodation on 6/8/23. The disabling of Ms. Tolbert's Employment ID was not discussed afterwards, because HR and the Global Product Training Team leadership still needed Ms. Tolbert continued to work hard until she left for surgery on 8/16/23.

On 8/7/2023, One week later, Ms. Tolbert picked up a huge, seemingly empty box from within her personal residence's mailroom. It was labeled as **a "Return" kit that including a laptop box, a typed note stating "Please don't forget to send back laptop charger", and a return label for Circana's Chicago Headquarter address: 203 N Lasalle St Chicago, IL - 60601 (Attn: Jamahl Deberry) (Ref: 3900)**

Please note: Ref: 3900" is a billing code associated with the Global Product Training Department. Therefore, **this return label and the associated cost is billed to Ms. Tolbert's work department "Global Product Training", and has to be approved by leadership**. The same department that Ms. Tolbert has requested for a retaliation complaint to be submitted, and was ignored by HR. Instead, she was quietly "administratively offboarded" on Tuesday, 8/1/23. Finally, Ms. Tolbert would be able come to a full understanding that this is, in fact, a **conspiracy for illegal termination of an employee with disability.** It is conclusive and substantial evidence after she received return boxes, labels, and a canceled Diners Club Card written notification on the evening of 8/7/23. Meanwhile, Ms. Tolbert continued to endure mental abuse while training multiple clients until she went on Short Term Disability on 8/16/23. As her disease, Hidradenitis Suppurativa had flared-up dramatically due to the ongoing adverse actions of retaliation. In 2023, Ms. Tolbert endured major reconstructive surgery and her arms were fully disabled for months and was on a medical device 24 hours per day for several weeks. This also caused emotional distress, as she Ms. Tolbert worked hard to restore her health after the investigated incidents of 2021 found in the 2022 EEOC Charge form. Lastly, Ms. Tolbert regularly attends psychotherapy sessions to help manage the barrage of emotions as to whether she will have income or health insurance while enduring continuous retaliation from Circana management.

### Discrimination in Similar Situation: Ms. Tolbert treated differently than white, male teammates

In a similar situation, Glen Brownson (Global Product Training Consultant) was given adequate notification that he would have been observed by management, Lucy Czech during the previous training sessions in 2023. In previous years, Ms. Tolbert was given 1-2 week notice minimum when management would be conducting a Formal Observation. This was standard practice for Ms. Tolbert's entire team (Omar Marrero, Sonya Goff, Karen Egri, and Jalisha Tolbert). Lucy Czech joined the Global Product Training team February 2023 as the Client Training Manager. She had served on the Training team prior to 2020, and she was a unilateral teammate at the time, who underwent the same Formal Observations from other managers i.e. Lynda Gutman, Michael Magnus, Amy Mackey. Therefore, Czech is aware of what standard practices would be for the Global Product Training team and the entire organization. However, Czech and the other managers have decided to take an "Ambush" approach by only telling trainers the day before that they will be scoring them for the Year-End Review via 'Formal Training Observation'. This causes extreme anxiety and triggers Ms. Tolbert's physical disability, Hidradenitis Suppurativa.

Please note: the usage of the word "Ambush" style determined to be used during a conference with the IDHR, Ms. Tolbert, and Circana in December 2022. This matter was proved in IDHR Charge No. 2022CF05262 pg. 11 paragraph 10. *"Magnus stated that he is not aware if any of his reports had a disability. Magnus stated that he jokingly used the term 'ambush style' to describe the process. Magnus stated that it was a poor choice of words and the Complainant objected to the term, stating that she felt that everyone present at the time meeting believed that*

*the term showed a lack of respect"*. In fact, this word "Ambush" has historical tones of those akin to Willie Lynch rhetoric, and how White Supremacist would corral around African Americans, eminently to "Ambush" and then ultimately to take life-threatening actions against citizens of color. This same word "Ambush", tactics and strategy has been implemented historically as notated in the September 19, 1868 article, "*White Mobs Ambush Black People in Georgia in Mass Lynching, Killing At Least Seven and Wounding At Least Thirty More*"
https://calendar.eji.org/racial-injustice/sep/19

Ms. Tolbert, an African American woman, immediately recognized this as an intimidation tactic, and indicated in a professional manner that this term creates a sense of anxiety for her as well as her teammates. Her teammates did not interrupt and nodded in agreement with her statement during the meeting. The below is an image from the IDHR Charge No. 2022CF0562, where it shows that Michael Magnus admits to the use of the word "Ambush" for the first time after Ms. Tolbert first team meeting upon return from short-term disability leave in 2021. He intended to create a sense of intimidation, and in fact did it in front of an audience of her teammates.

---

**Charge No. 2022CF0562**
**Page 6 of 27**

9.     Magnus denied that Respondent subjected Complainant to unequal terms and unequal terms and conditions of employment.

10.   Magnus stated that it is standard practice at Respondent for managers to periodically observe their reports who conducted client training conducting their training sessions. Magnus stated that prior to March 2021, managers would notify their reports that they would be observing the training sessions. Magnus stated that in March 2021, his supervisor, Amy Mackey ("Mackey")(non-black, female, non-disabled, No-PA), Principal, Solutions Training & Adoption, and he discussed changing the review process so that managers would not inform their reports that they were observing the training sessions so that they could get a more accurate view of how the trainer was performing. Magnus stated that during a meeting on June 7, 2021, he told his reports, including Complainant, that moving forward, he would conduct unannounced observations of their training sessions. Magnus stated that his reports included seven (7) Solutions Training & Adoption Consultants, of whom two (2) individuals (71%) were race, black and three (3) individuals (43%) were sex, male. Magnus stated that he is not aware if any of his reports had a disability. Magnus stated that he jokingly used the term 'ambush style' to describe the process. Magnus stated that it was a poor choice of words and Complainant objected to the term, stating that she felt that everyone present at the meeting believed that the term showed a lack of lack of respect. Magnus denied that the comment was directed at Complainant and Respondent never undertook the unannounced observations

**Precipitating Events: Disability Discrimination 2021-2022 cited in EEOC Charge Form**

All Client Product Training Team Managers (i.e. Lucy Czech, Michael Magnus, Amy Mackey) have been aware of Ms. Tolbert's disability from an on-going investigation where a potential job offering was rescinded after several months on short-term disability from a life-threatening occurrence. In Feb. 2021, Ms. Tolbert was diagnosed with Deep Vein Thrombosis (blood clot in calf), yet expected to continue to train a new implementation (Tootsie Roll), where she sat multiple days for 3 hours at a time. Within 5 days, the blood clot shattered and logged into Ms. Tolbert lungs resulting in her spitting up blood all night. In fact, Ms. Tolbert had to leave work several hours early to be rushed to the Emergency Room to be diagnosed with a Pulmonary Embolism. Her physicians stated that she needed to have her legs elevated as she was prescribed blood-thinners.

This led to months of short-term disability, going to a Coumadin Clinic 3 days per week to check her blood levels, walking on a cane, and the loss of nerve functions in the left leg. Ms. Tolbert returned to work only to experience Retaliation from multiple managers on the Global Product Training Team. This was documented and given to the IDHR in 2021-2023. Despite all the exhibit evidence and collection of medical records, the IDHR dismissed the case citing "Due to substantial lack of evidence". In fact, there is email source evidence supporting that management was fully aware of Ms. Tolbert's disability and chose not to adhere to Reasonable Accommodation procedures for an employee with a major, life-threatening illness and disability.

Evidence of Deep Vein Thrombosis and Pulmonary Embolism was cited in the IDHR Charge No. 2022CF0562 Pg. 11, Paragraph C.1 "...Verification of Disability signed by Cezar Tolentino M.D. indicates that Complainant was diagnosed with DVT on February 22, 2021. The Verification indicates that Complainant's condition was not minor and was not permanent." Also, IDHR Charge No. 2022CF0562 Pg. 11, Paragraph C.2 states, "Complainant stated that Respondent never had a policy of unannounced observations before she went on medical leave, and she believes that the policy was adopted when she returned to work as a deliberate attempt to demean her performance. Complainant stated that she believes that Magnus' actions were directed at her because of her race, sex, and disability."

---

**C.**     **Complainant's Rebuttal.**

    1.     Complainant's April 29, 2022, Verification of Disability signed by Cezar Tolentino M.D. **(Exhibit F)** indicates that Complainant was diagnosed with DVT on February 22, 2021. The Verification indicates that Complainant's condition was not minor and was not permanent.

    2.     Complainant stated that Respondent never had a policy of unannounced observations before she went on medical leave, and she believes that the policy was adopted when she returned to work as a deliberate attempt to demean her performance. Complainant stated that she believes that Magnus' actions were directed at her because of her race, sex, and disability.

Lastly, Ms. Tolbert offered a preponderance of evidence to establish that all Circana Managers within her Global Product Training Department were aware that she was a protected citizen with a documented disability and that she in fact endured a hostile work environment, and continuous acts of Retaliation. Ms. Tolbert sent Ms. Reivis Barileau, IDHR Investigator II, a detailed overview for outstanding questions presented in the Fact Finding Conference on December 15, 2022, including source document evidence via email on 3/19/23 and Ms. Barileau responded "Acknowledging Receipt"on 3/20/23. Ms Tolbert shared the following with Ms. Barileau, which has conclusive evidence of retaliation against an employee with a disability who filed a legal complaint with the IDHR, EEOC, and Human Resources of Circana.

-------------------------------------------------------------------------------------------------------------------------------

Hi Ms. Barileau,

[Ms. Tolbert] wants to thank you again for completing a thorough Fact Finding Conference 12.15.22. [She] wanted to respond to a few questions that you asked as well as some comments made by the Respondent(s).

Regarding the unjust, unfair, and simply discriminatory PIP that [Ms. Tolbert] was placed on from late 2018 through mid-2019 has been attached. Please note: This is where [Ms. Tolbert] learned that [she] was truly being discriminated against, while dealing with a severe disability (Hidradenitis Suppurativa). Every time [she] found herself under a barrage of inappropriate verbal attacks from IRI/Circana Management, my health would decline severely.

In my rebuttal to IRI/Circana Management's 2018-2019 PIP, I stated on Page 17, section 1g. (Please See Emails "**PIP Employee Response 12.20.2018 and 2.7.2019**")

> "*Maintain Employee Flexibility & Break-Time: Per my **physical disability**, I am requesting to maintain employee flexibility to go to any necessary "physician appointments/specialist treatments" as needed throughout my career at IRI/Circana/Circana/Circana. I am requesting an "equal" work environment, where I feel supported during medical emergencies, so work duties are upheld by management and trainers. In addition, if I need extra time for a "Break" to use the restroom or take prescribed medications from my doctors, I should be treated fairly as I maintain a professional appearance before the clients.*"

During this period, it was one of the most crucial times in Ms. Tolbert's life. Michael Magnus would look for incriminating evidence from other employees and clients attempting to slander her business reputation and defame her character at IRI/Circana. [She] was utterly depressed and in continuous physical pain (ie. open infected wounds beneath her clothes), while smiling for clients on the road weekly on average. IRI/Circana prioritizes external clients over the health and wellbeing of its employees. Michael Magnus, Human Resources, and the previous Training Team Lead all were aware that [Ms. Tolbert] had a severe disability and needed Reasonable Accommodations to remain healthy while working.

Moreover, the health crisis [Ms. Tolbert] experienced in February of 2021 was not the first time that [she] faced a life altering medical emergency. As cited in [her] PIP response on Page 2, Number 3

> "**Trainer Emergency Surgery**: Unfortunately, [Ms. Tolbert] experienced a life-threatening medical emergency, where [she] was rushed to the ER on Sunday evening, 7/7/18.

During this ER visit, [she] found out that there was a mass in [her] chest, and [she] needed an emergency surgery. A surgeon inserted a postoperative tubular stent in [her] left breast, and deemed ineligible for travel due to the severity of the operation. Although [she] strived for perfection as an IRI/Circana employee, [her] immediate health was in danger. Thus, sending any training documents, as[she] was heavily sedated (with IV dispensed medications), was more than a burden that anyone should have to endure".

**Please Note:** Ms. Tolbert was still expected to ensure that training documents were prepared for a class that she was not able to teach. She sent documents that were stored in a cloud service from the hospital. Again, a disabled employee should not be expected to work while in critical condition in the hospital. IRI/Circana blatantly showcases Disability Discrimination and is not upholding the values of the American Disability Act. Regardless of the pain, Ms. Tolbert was expected to perform job duties routinely, which is the same scenario that occurred in March 2021 after experiencing a blood-clot in her left leg, which broke up and traveled to [her] lungs. The blood clot in [her] lung was a result of not having [her] legs elevated as my doctors had recommended. Ms. Tolbert was under coercion and pressured to work as she had been threatened since 2018 for job termination if [she] could not uphold [her] working role even when bitterly ill.

During the conference with the IDHR on 12/15/22, Amy Mackey testified that she had no idea that Ms. Tolbert had a disability until her lawyer sent demands in October 2021. The following email shows that [Ms. Tolbert] had a short-term disability with no estimated return date on 3/22/22. (See email "**RE: Leave of Absence- Transition of Work Duties (Hand-off) 3/23/21 until TBD- 3.22.22**") Amy replies to Ms. Tolbert's leave of absence therefore highlighted that she was aware of her disability **BEFORE** Ms. Tolbert filed a formal complaint in October 2021. She aggressively suggests that Ms. Tolbert should alter her Out of Office response. Amy Mackey states,

"*Also, since you will be out for an extended period of time I would ask that you don't list that you will respond to the message when you return. Since we don't know when that will be, I would ask that it says I am out of the office, please reach out to Mike Magnus. What I don't want is for people to think you're coming back tomorrow and be waiting for your response. I would ask this of anyone out on leave". - Amy Mackey (Global Product Training Team Lead)*

Instead of showing compassion during a frightening and life-threatening crisis i.e., Deep Vein Thrombosis (blood clot in leg) and Pulmonary Embolism (blood clot in lung). Amy Mackey is more concerned with an Automatic Out-of-Office response as opposed to what is your prognosis and how can we be helpful as your health is severely declining.

On 4/12/21, Ms. Tolbert sent a follow-up message regarding the status of her disability. (Please see email "**Leave of Absence Extended until 4/26/21 - Transition of Work Duties (Hand-off)**"). A physician's note is included with the names of my listed disabilities "Deep Vein Thrombosis and Pulmonary Embolism", therefore there is absolutely no way that Amy Mackey or Michael Magnus was unaware that Ms. Tolbert had a physical disability. Those statements were false testimony and within the source emails, the evidence is easily found.

**Hostile Work Environment**

**PIP Response – Page 16, Section 1a. Minimal Unwarranted Surveillance**:

> "Soliciting for feedback" *from IRI/Circana/Circana/Circana representatives creates an unjustified sense of constant surveillance between my co-workers and me. The role of trainer is one of autonomy and requires me to maintain professional relationships, where each employee should feel comfortable, valued, and respected. Michael Magnus has demonstrated the constant desire to report to others to "**find evidence" of "unprofessional behavior**" despite great reviews from clients and internal client teams. This should not be a requirement of working at IRI/Circana because these terms are based upon perception and can be subject to error as proven above i.e. Amy Mackey (3/27/18) and Michael Magnus (10/26/18- Nature Nate's & 11/16/18-Camposol)."*

Again, these are examples of the hostile work environment where Ms. Tolbert was under constant surveillance outside of policy. We have internal 360 Feedback and Client Training Surveys to ensure that everyone can provide honest feedback without being persuaded by any supervisor's bias.

**Threatening Termination**

**PIP Response – Page 16**

> "*Failure to show immediate and sustained improvement in your overall performance may result in further disciplinary action, up to and including termination of your employment with IRI/Circana/Circana/Circana."* – Michael Magnus and HR note found within *"Expectations Going Forward".*

All in all, please note that IRI/Circana management including Michael Magnus refused to acknowledge or respond to Ms. Tolbert's PIP Response/ Rebuttal. She reached out a second time requesting signatures on 2/7/2019, after initially sending it to HR, Stephanie Withrow. Her rebuttal was ignored, but sharing evidence with HR only intensified Circana's management team to find alternate means to either illegally terminate, stifle career promotion, or use intimidation tactics to weaken an employee with disability.

**Conclusion:**

All these incidents have been on-going acts of retaliation against an employee with disability. Circana management fabricated when stating that they had no idea that Ms. Tolbert had a disability. They failed to provide Reasonable Accommodations for a fair and just environment for a protected class citizen. She has lost months of physical and mental health  from 2018-2023, job promotion opportunities i.e. DEI Program Manager 2021, professional development events such as 2023 Growth Summit, endured verbal harassment, and stonewalling from leadership. Ms. Tolbert asked the court to hear her plead for justice under Title VII and the ADA. She received a Right to Sue letter from the EEOC while on short term disability in October 2023. Currently, Ms.Tolbert is seeking compensatory, punitive, and special damages to compensate the plaintiff for the deliberate acts that caused harm or gross negligence by Circana and its management teams.